STATE OF NORTH CAROLINA v. EUGENE EDMONDSON

No. 88

(Filed 1 June 1973)

1. Criminal Law § 92— consolidation of assault and murder charges

The trial court did not err in the consolidation for trial of two charges against defendant of felonious assault and one charge of homicide where the shootings of the assault victims were directly connected with and contemporaneous with the shooting of the homicide victim.

2. Homicide § 21— first degree murder — sufficiency of evidence

The evidence was sufficient for the jury in a prosecution for first degree murder where defendant, himself, testified he shot the victim, a doctor testified this was the cause of death, and an eyewitness testified that the shooting was deliberate, premeditated and unprovoked.

3. Criminal Law § 169; Homicide § 19— statement over telephone by defendant — testimony that deceased overheard — exclusion as harmless error

In this homicide prosecution, defendant was not prejudiced by error, if any, when the court sustained objections to defendant's testimony as to whether deceased overheard defendant's statement by telephone to a third person as to the reason why defendant did not like to ride around with deceased, where the objections were sustained after the witness had answered and the jury was not instructed to disregard the testimony, and defendant subsequently testified without objection that, in response to an inquiry by deceased, he stated to deceased at the scene of the shooting exactly the same reason for not wanting to ride around with him.

4. Homicide § 19— threats to third person — inadmissibility

In this homicide prosecution, the trial court did not err in the exclusion of testimony that deceased had threatened to blow the witness's head off where there was no contention that defendant knew

---

State v. Edmondson

---

of such episode and no other evidence indicating that deceased was a violent man or had such a reputation, known to defendant.

**5. Homicide § 28— instructions on duty of aggressor to retreat**

In a homicide prosecution wherein defendant contended he shot deceased in self-defense, defendant's own testimony supported the court's charge to the jury with reference to the duty of an aggressor to retreat.

**6. Criminal Law § 113; Homicide § 28— instructions on self-defense and intoxication**

Where the court charged the jury in full detail upon self-defense and upon intoxication as a defense, the court did not err in failing to refer to defendant's plea of self-defense and his defense of intoxication in portions of the charge stating what the jury must find in order to return a verdict of guilty of first degree murder or second degree murder of one victim or a verdict of guilty of felonious assault of another victim.

**7. Criminal Law § 6; Homicide § 28— instructions — bearing of intoxication on intent — second degree murder and manslaughter**

The trial court did not err in instructing the jury that the law does not require any "specific intent for the defendant to be guilty of the crimes of second degree murder or manslaughter" and, therefore, the defendant's intoxication could have no bearing upon the jury's determination of his guilt or innocence of those crimes if the jury should come to consider either of them.

**8. Assault and Battery § 17— verdict — assault with deadly weapon — sentence for assault with firearm**

Although the indictment charged and the evidence showed that the deadly weapon used in an assault was a firearm, the jury's verdict of guilty of "assault with a deadly weapon with intent to kill" will not support a sentence of five years for assault with a firearm with intent to kill pursuant to G.S. 14-32(c) but will support a maximum sentence of two years under G.S. 14-33(c).

APPEAL by defendant from *Tillery, J.,* at the December 1972 Session of MARTIN.

Under separate indictments, each proper in form, consolidated for trial, the defendant was convicted of: (1) Assault upon Ronnie Gurganus with a deadly weapon with intent to kill, (2) assault upon Gary Tyson with a deadly weapon with intent to kill, inflicting serious injury, and (3) murder in the first degree of Dallas Ward Jones. For these offenses, and in that order, he was sentenced to imprisonment for five years, to imprisonment for 10 years to begin after the expiration of the five year sentence, and to imprisonment for life to begin at the expiration of the 10 year sentence.

The evidence for the State is to the following effect:

On the afternoon of Sunday, 27 August 1972, the defendant, his nephew, Ricky Scott, and Dallas Ward Jones, all young men, were riding about in the automobile of Jones, laughing and joking together. They purchased and drank two pints of wine, most of it being consumed by the defendant. Jones had his rifle in the car. Scott got out and shot the rifle for amusement a few times.

Jones and the defendant got into a conversation concerning the possibility of Jones getting a job at the plant where the defendant worked and the defendant said he would talk to his boss the next day. Subsequently, he suggested that they go immediately to his boss' home to talk to him but Jones preferred that this be delayed until the next day.

The three then returned to the defendant's home to get some clothes which the defendant had previously promised to give to his nephew, Scott. The defendant and Scott went into the house and got the clothes. While therein, the defendant filled his pocket with shotgun shells and told Scott he was going to kill Jones for the reason that he just didn't like him. After further conversation, the defendant said that he was not going to kill Jones but was going to scare him.

The defendant and Scott then left the house and got back into the car with Jones, the defendant carrying his shotgun. All agreed to go to Ballard's bridge and there do some target practice.

Arriving at the bridge, Jones stopped the car and started to take out his rifle, which was on the back seat. At that time the defendant, was was already out of the car, pointed the shotgun at Jones, told him not to take the rifle out and ordered him to walk around the car with his hands up. Jones said, "Wait a minute, man, what's going on?" The defendant directed Jones to stand near the bushes. When Jones asked if the defendant wanted the keys to his car, the defendant made no reply but shot Jones in the back. He then directed Scott to cover Jones with brush and briers, which Scott did. The defendant and Scott then got back in the car but, finding that the keys were still in Jones' pocket, the defendant ordered Scott to get them, which he did.

The defendant and Scott then drove away but returned almost immediately and saw that Jones had crawled out from

under the covering of brush so that he could be seen from the road. The defendant ordered Scott to pull into a side road or path nearby, to get out and cover Jones again and "to get down in his ear and talk to him" to see what Jones "had to say about it." Scott called Jones by name several times but Jones did not answer other than groaning. Scott again covered Jones with brush. He and the defendant again started to leave in the automobile. As they were coming out of the side road or path, they observed Gary Tyson and Ronnie Gurganus pass in another car, stop and look at the body of Jones lying in the brush. Thereupon, the defendant ordered Scott to drive back to their car, saying he was going to have to kill them too.

When the defendant and Scott drove up behind the other car, Gary Tyson said to the defendant, "Somebody's been shot and needs help bad." The defendant, making no reply except to call out Gary Tyson's name, got out of the automobile with his shotgun. Tyson said, "Don't shoot me, Eugene," and turned to run. Thereupon, the defendant shot Tyson in the chest. By that time, Ronnie Gurganus was running away. The defendant shot at him, one or two pellets striking him, inflicting no injury. Gurganus fled into the woods and the defendant was unsuccessful in his effort to follow and find him. Meanwhile, Tyson also fled from the scene. He was taken to the hospital and received treatment there for his wound.

The defendant and Scott then continued to drive through Martin and Pitt Counties until after dark. Finally, they ran the car into a ditch and abandoned it. After trying, unsuccessfully, to find another automobile which they could steal, they were arrested while walking along the road.

Jones was dead when found by the officers summonsed to the scene as the result of the shooting of Tyson. The shotgun wound in his back was the cause of death.

The defendant testified as a witness in his own behalf, Scott having testified as a witness for the State. The defendant's testimony was to the following effect:

When Scott first telephoned the defendant to suggest that he join Scott and Jones in riding about, the defendant said that he would do so but did not really want to ride with Jones "because he messes around with a lot of girls under age."

The record shows that, in response to his attorney's questions, the defendant said that the telephone in the Scott home had an extension and the defendant found out from Jones that Jones was listening to the conversation between the defendant and Scott when the defendant made the above statement concerning Jones. The record shows that after the defendant answered the questions in this manner the court sustained objections by the State but the record does not show that the court instructed the jury to disregard the answers.

Thereupon, the defendant continued to testify to the following effect:

When the three arrived at Ballard's bridge for the contemplated target shooting, Jones asked the defendant why he did not want to ride around with Jones, and the defendant gave Jones the same explanation, namely, "Because he messed around with a lot of young girls."

As the three were getting out of the car, the defendant reached around to get his shotgun and observed that Jones had his rifle pointed in the defendant's face. Falling on his knees outside the car, the defendant crawled along his side of the car toward the front and watched Jones' feet as Jones walked toward the back. The defendant then raised up and shot Jones. Not knowing what to do, he told Scott to get Jones out of the road. He and Scott started to town to report the shooting. Looking out of the back window, the defendant saw that Jones was crawling toward the road so he instructed Scott to pull into a side path and go back to help him. While they were turning around, Tyson and Gurganus passed them and when they reached the place where Jones lay, Tyson and Gurganus were already there standing outside their car. When the defendant got out of the car, he was carrying his shotgun and Tyson jumped for Jones' rifle which was lying on the ground. Thereupon, the defendant shot Tyson in the chest. He did not shoot Gurganus.

Scott had previously testified as a witness for the State to the effect that Jones' rifle was still in the back seat of the car after Jones was shot and that the defendant threw the rifle in the woods after shooting Jones.

*Attorney General Robert Morgan and Special Counsel Ralph Moody for the State.*

*Elbert S. Peel for defendant.*

LAKE, Justice.

[1]  The defendant's first assignment of error is to the consolidation of the three cases for trial over his objection. G.S. 15-152 expressly permits the consolidation for trial of two or more indictments against a person for "two or more acts or transactions connected together." The shootings of Tyson and Gurganus were directly connected with and, for all practical purposes, contemporaneous with the shooting and killing of Jones. There was no error in the consolidation of these charges for trial. *State v. Overman,* 269 N.C. 453, 466, 153 S.E. 2d 44; *State v. White,* 256 N.C. 244, 123 S.E. 2d 483.

[2]  The second assignment is to the denial of the defendant's motion for judgment of nonsuit. There is obviously no merit in this assignment. *State v. Cooke,* 278 N.C. 288, 179 S.E. 2d 365; *State v. Primes,* 275 N.C. 61, 165 S.E. 2d 225. The defendant, himself, testified that he shot Jones. The doctor who performed the autopsy testified that in his opinion this was the cause of death. Scott, the only surviving eyewitness other than the defendant, testified that the shooting was deliberate, premeditated and unprovoked, and that the rifle of the deceased was still in the back seat of the car after the shooting of the deceased. The testimony of the defendant concerning his contention that the shooting was in self defense raised a question for the jury, not for the consideration of the court on the motion for judgment of nonsuit. *State v. Price,* 280 N.C. 154, 184 S.E. 2d 866.

[3]  The third assignment of error is to the court's sustaining objections to the defendant's testimony as to whether Jones overheard the defendant's statement by telephone to Scott as to the reason why the defendant did not like to ride around with Jones. It appears from the record that the solicitor's objections were sustained after the witness had answered in the presence of the jury and the jury was not instructed to disregard the testimony. Thus, as a practical matter, the defendant had the benefit of the evidence. Furthermore, without objection, the defendant subsequently testified that when he and his companions arrived at the scene of the shooting, in response to an inquiry by the deceased, the defendant stated to the deceased exactly the same reason for not wanting to ride around with him. This cured any error which there may have been in the ruling of the court now assigned as error. "The exclusion of testimony cannot be held prejudicial when the same witness is thereafter allowed

to testify to the same import, or the evidence is thereafter admitted, or the party offering the evidence has the full benefit of the fact sought to be established thereby by other evidence." Strong, N. C. Index 2d, Appeal and Error, § 49, and numerous cases there cited.

[4] The fourth assignment of error is to the sustaining of the solicitor's objection to the question to the defendant's witness Cherry as to whether the deceased ever made any threats against Cherry. Had Cherry been permitted to answer the question, he would have said that the deceased at one time said to Cherry, "I will blow your head off." There is no contention that the defendant knew of this episode. There was no other evidence indicating that Jones was a violent man or had such a reputation, known to the defendant. The excluded testimony had no relevancy to the reasonableness of the defendant's asserted fear that Jones was about to kill him. There is no merit in this assignment of error.

[5] The fifth assignment of error is to the court's charging the jury with reference to the duty of an aggressor to retreat. This was part of the court's charge concerning self defense. The defendant contends this was error because "there was no evidence of any fight or any altercation or dispute." On the contrary, the defendant testified, in direct contrast to the testimony of Scott, that as he was preparing to get out of the car at the scene of the shooting, he suddenly observed Jones pointing his rifle in the defendant's face and thereupon he fell to his knees outside the car and the two men crept around the car on opposite sides of it, each armed with a gun and that his shooting of Jones "was self defense." We find no error in this portion of the charge of the trial judge.

[6] Assignments of Error 6, 7 and 8 assert that, in the portions of the charge wherein the court was stating what the jury must find in order to return a verdict of guilty of first degree murder, a verdict of second degree murder, and a verdict of guilty of assault with a deadly weapon, inflicting serious injury (in connection with the shooting of Gary Tyson), the court failed to refer to the defendant's plea of self defense and to his contention that he was not guilty by reason of intoxication. The court charged the jury in full detail both upon the matter of self defense and also upon the matter of intoxication as a defense, and the defendant does not contend that these instructions were incorrect in any respect. The trial judge is not re-

quired to include in each sentence of his charge every relevant principle of law. "A charge will be construed contextually as a whole, and when, so construed, it presents the law of the case in such manner as to leave no reasonable cause to believe the jury was misled or misinformed, an exception thereto will not be sustained, even though the instruction might have been more aptly given in different form." Strong, N. C. Index 2d, Trial, § 33. So considered, we find no error in the instructions given to the jury concerning self defense and intoxication.

[7] The defendant's Assignment of Error No. 10 is to the court's instruction that the law does not require any "specific intent for the defendant to be guilty of the crimes of second degree murder or manslaughter" and, therefore, the defendant's intoxication could have no bearing upon the jury's determination of his guilt or innocence of those crimes if the jury should come to consider either of them. The jury found the defendant guilty of first degree murder and so did not come to a consideration of his guilt of the lesser charges. The judge instructed the jury that to return a verdict of guilty of first degree murder, it must be satisfied beyond a reasonable doubt "that the defendant intended to kill Dallas Jones." As above noted, he charged correctly and in detail as to the bearing of intoxication upon the presence or absence of the "specific intent required for conviction of first degree murder." He likewise charged the jury with reference to intent as an element of the assault charges and concerning the relevance of intoxication thereto. There is no merit in this assignment of error.

The charge of the court with reference to self defense fully incorporated the principles governing this defense as laid down in *State v. Marshall*, 208 N.C. 127, 179 S.E. 427. We have carefully considered the charge in its entirety and find therein no error prejudicial to the defendant.

[8] In Case No. 72CR3490 the indictment charged that the defendant "did unlawfully, wilfully and feloniously assault Ronnie Gurganus with a certain *deadly weapon, to wit: a 12 gauge shot gun, a firearm* with the felonious intent to kill and murder the said Ronnie Gurganus inflicting serious injuries, not resulting in death * * *" (Emphasis added.) The verdict was, "Guilty of the charge of Assault with a *deadly weapon* with intent to kill." (Emphasis added.) The judgment is that the defendant, "having been found guilty of the offense of Assault with a *firearm* with intent to kill which is a violation of G.S. 14-32(c)

and of the grade of Felony" (emphasis added), be imprisoned for a term of five years. The verdict, as shown in the record, does not support the judgment, though it is clear from the evidence that the deadly weapon used was a firearm. Upon this verdict, G.S. 14-32(c) does not apply and the maximum sentence is two years. G.S. 14-33(c). See, *State v. Bentley*, 223 N.C. 563, 27 S.E. 2d 738. For this reason, the judgment in Case No. 72CR3490 is arrested and Case No. 72CR3490 is remanded to the Superior Court of Martin County for the entry of a judgment therein in accordance with the verdict. See, Strong, N. C. Index 2d, Criminal Law, § 127.

Case No. 72CR3490—Judgment Arrested and Remanded for Judgment.

Case No. 72CR3488—No error.

Case No. 72CR3489—No error.