STATE OF NORTH CAROLINA v. ELLEHUE JONES

No. 8516SC1392

(Filed 30 December 1986)

1. **Homicide §§ 17.2, 19.1— reputation of victim—threats against defendant—not admissible**

   The trial court did not err in a murder prosecution by refusing to admit evidence of the victim's history and reputation for violence and evidence of a threat the victim had made to defendant where defendant's own evidence showed that, at least at the time of the fatal shot to the head, the deceased did not present any threat of imminent harm to the defendant or appear to be doing so.

2. **Homicide § 26— second-degree murder—instructions on malice—no plain error**

   The trial court did not commit plain error in a homicide prosecution by instructing the jury in the final mandate that second-degree murder is a killing without malice where the trial court had repeatedly instructed the jury that they must find the defendant acted with malice in order to find him guilty of second-degree murder and instructed the jury that the defendant could be guilty of no more than voluntary manslaughter if the State failed to prove that he acted with malice.

3. **Criminal Law § 138.21— second-degree murder—especially heinous, atrocious or cruel**

   The trial court did not err by finding that a second-degree murder was especially heinous, atrocious or cruel where defendant fired two shots from close range into the victim's groin, leaving four holes in the scrotum, then

walked over to the victim, stood over him for a few seconds and fired the third and fatal bullet into his head.

**4. Criminal Law § 138.22— second-degree murder—weapon dangerous to more than one person**

A .38 caliber handgun is not normally dangerous to the lives of more than one person and the trial court erred by finding that aggravating factor in a prosecution for second-degree murder.

**5. Criminal Law § 138.40— mitigating factor—acknowledgment of wrongdoing— not available with self-defense**

The trial court did not err by failing to find as a mitigating factor that defendant voluntarily acknowledged wrongdoing to a law enforcement officer prior to arrest or at an early stage of the criminal process where defendant had confessed the details of the shooting to a law enforcement officer but had relied on self-defense at trial.

APPEAL by defendant from *Lane, Judge.* Judgment entered 8 April 1982 in Superior Court, ROBESON County. Heard in the Court of Appeals 12 May 1986.

*Attorney General Lacy H. Thornburg by Assistant Attorney General George W. Lennon for the State.*

*Appellate Defender Malcolm Ray Hunter, Jr., by Assistant Appellate Defender Robin E. Hudson for the defendant.*

COZORT, Judge.

Defendant petitioned this Court for a writ of certiorari to review his 8 April 1982 conviction for second-degree murder. By order of 24 April 1985, we allowed the petition.

Defendant contends the trial court erred: (1) in excluding evidence of a telephone conversation between the deceased and the defendant where the deceased threatened defendant's life; (2) in instructing the jury that second-degree murder is the unlawful killing without malice; (3) in finding as aggravating factors (a) that the "offense was especially heinous, atrocious, or cruel," and (b) that the "defendant knowingly created a great risk of death to more than one person by means of a weapon . . . which would normally be hazardous to the lives of more than one person"; and (4) in failing to find as a mitigating factor that defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer at an early stage of the criminal process. We find no error in defendant's conviction; however, we find

the court erred in its findings of one of the aggravating factors, and we remand for resentencing.

The State's evidence tended to show the following:

Defendant lived with Pammy Gail Lowery for about two and a half years prior to June 1981. She had two children, a boy and a girl, by defendant. The children were in defendant's custody. During the end of June or July 1981, Ms. Lowery began "going with" John Allen Hall. On the date Hall was killed, 27 December 1981, Ms. Lowery was eighteen years old and pregnant with Hall's baby.

Ms. Lowery testified that on 27 December 1981, she was at her grandmother's house, along with Hall, two of her aunts, and their boyfriends. About 2:30 in the afternoon defendant called to say he was coming by to pick up his son. When defendant arrived at Ms. Lowery's grandmother's house, he took the boy off the bed and started out the front door. Ms. Lowery got in front of him and told him he was not taking the boy. Defendant turned around and started out the back door and Ms. Lowery started pulling on the baby. Defendant struck Ms. Lowery on the head with a pistol four times. After Ms. Lowery was struck on the head, Hall got up off the living room couch where he had been sitting and moved toward a door. When defendant and Hall were about nine feet apart, defendant shot Hall, who grasped his side and fell to the floor by a chair. Ms. Lowery testified that, after the defendant shot Hall once, defendant said, "John Allen Hall, you son of a bitch." Defendant then shot Hall again. Hall was not moving and was lying on the floor when the third shot was fired by defendant into Hall's head. Defendant was "about two feet" from the deceased at the time the last shot was fired. At no time did Hall, who was unarmed, make any threatening actions or remarks to the defendant. While defendant was firing the gun, he was holding his son, Danny Hue, in his left arm. Defendant then struck Ms. Lowery in the head and left the house.

Dr. Bob Andrews, a pathologist, testified that he examined the body of Hall. The body had received no more than three bullets which made nine wounds. There were four holes in the victim's scrotum, being entrance and exit wounds made by the bullets, and one hole in the deceased's forehead. The remainder of

the wounds were in the deceased's thighs. Hall's cause of death was the gunshot wound to the head.

Robeson County Deputy Sheriff Bobby Rogers testified that he went to the defendant's home on 27 December 1981 to find the defendant, but the defendant was not there. Defendant's father brought him to the station a short while thereafter. Defendant was cooperative, and, after being read his rights, at 4:45 p.m. gave the following written statement:

Pammy Gail Lowery and myself used to live together. While we were living together we had two children, a girl and a boy. After we quit staying together I had kept the kids. This past Friday Pammy Gail had picked up the two children. I had agreed to Pammy Gail to keep them this weekend. This morning I called Pammy Gail and asked her to get the children's clothes together and I would be over to pick them up in about thirty minutes hour [sic]. Pammy told me she was going to keep the little boy. I said no, go ahead and get them ready. I will be there to get both of the children. I left home and went to Pammy's residence. I went in; John Allen Hall was sitting on the couch holding Pammy's head in his lap. I asked Pammy where the children was. Pammy said, the boy is in there, but Amy the little girl, was with Pammy's mother. I said, get the boy's clothes. Pammy told me I won't leaving with him. I went on into the bedroom and picked up the boy. I started out and Pammy got in front of me. I pushed her out of the way and John Allen Hall stood up, and I said, I'm going out the back door. Pammy ran into the kitchen and got back in front of me and tried to stop me and I pushed her out of the way and told her to get the hell out of my way. Pammy started crying. John Allen Hall started to the kitchen. I turned around and shot John Allen. John Allen Hall went back towards the living room. I walked back towards the living room. Pammy was still trying to take the baby. I saw John Allen Hall on the floor. I shot him again. I then hit Pammy in the head with the pistol and left. I shot three times. I don't remember whether it was twice in the kitchen or twice in the living room. There were some boys there and Marilyn and Jessica Lowery when the shooting took place. Signed, Ellehue Jones.

Defendant's evidence, with the defendant testifying, tended to show the following:

Defendant called Ms. Lowery at her grandmother's house at 2:00 p.m. on the 27th of December to tell her he was coming to get the children, and Ms. Lowery told him he was not taking the children anywhere. Defendant went to Ms. Lowery's grandmother's house and, after asking Ms. Lowery where the boy was, went into the bedroom and picked him up. When defendant started out the bedroom door, Ms. Lowery got off the couch and came towards the defendant telling him, "you ain't going nowhere with him." Defendant responded, "you move out of the way and let me out of the house," but Ms. Lowery would not move, so defendant pushed her to the side; and when he did, John Hall stood up at one end of the couch. So the defendant said, "I'm going out the back door." Defendant turned and went towards the back door, but by the time he got to the back door in the kitchen, Ms. Lowery was standing between defendant and the door pulling on defendant's arm. She would not let defendant out the door. Defendant looked around and saw John Hall come in the kitchen towards him. Defendant testified:

> When I turned around and observed him coming on me I pulled [the gun] out and I shot him twice. She still had hold of me [question omitted] . . . and I hit her over the head with [the gun] twice as far as I can remember.
>
> * * * *
>
> A. . . . I shot it twice. I hit her in the head a couple of times with it and started to walk out the front door, and he was laying there on the floor; he won't dead, and I stopped. When I stopped there, I stayed there for a few seconds, and he was laying, he wasn't dead, he was moving a little bit. By that time when I stopped there he throwed his hand out like that to me. I was standing there. I was already shook up, and he throwed his hand out like that and I shot again.

The defendant walked out of the house, got into his car, and left. Defendant testified that when he first shot John Hall, he was about four feet from him.

On cross-examination defendant testified that it was not Hall who was keeping him from going out of the house; rather, it was

Ms. Lowery. Defendant testified that he "didn't give time to take no look" to see if John Hall had anything in his hands; [defendant] "won't taking no chances."

Defendant later testified that John Hall had his hands around his [John Hall's] waist and after he [defendant] pushed Ms. Lowery, John Hall "came in there with anger, going to get me." Defendant testified that John Hall "didn't stumble back at the first shot; he was shot twice in the kitchen and went back to the living room, and in somewhat form or fashion he fell about that time and I turned around and hit Pammy Gail twice with the butt of the pistol." When asked by the prosecutor whether Hall turned around and went in the other direction to the stereo when defendant first shot him, defendant testified as follows:

> I don't know. I shot him twice and there was Pammy Gail landing on me and the young'un, and I got her off of me and I was going out the front door and he was between the kitchen door and the living room door and and when he was on the floor at the front of the stereo and I stopped there at his head in front of me he was not dead then, and I was standing there a few seconds and he, just like as if I was standing right over him nearly two or three feet, like he threw his hand out to grab me, whatever, and I was half scared to death; I shot again right when he threwed his hands up, I shot again.

At the close of all the evidence the court refused to instruct on self-defense. During the trial court's final mandate, after having correctly instructed the jury on second-degree murder, malice, and voluntary manslaughter, the jury was instructed that "second degree murder is the unlawful killing of a human being without malice." Defendant did not object to this instruction. Defendant was convicted of second-degree murder. The court sentenced defendant to twenty years' imprisonment having found as aggravating factors (1) that "[t]he offense was especially heinous, atrocious, or cruel," (2) that "defendant knowingly created a great risk of death to more than one person by means of a weapon which would normally be hazardous to the lives of more than one person," and (3) that "defendant has a prior conviction or convictions punishable by more than 60 days' confinement." The court found no mitigating factors.

[1]   Defendant first assigns as error that the trial court erred in refusing to allow into evidence John Allen Hall's history and reputation for violence of which defendant was aware and a threat John Allen Hall made to defendant. We find no error in the exclusion of such evidence.

The court sustained the prosecutor's objections to defendant's testimony regarding a telephone conversation between him and the deceased about three weeks before defendant shot Hall. Outside the jury's presence, defendant explained that a person identifying himself as John Allen Hall and whom he recognized as Hall, called him on the telephone and told defendant he had bought "a thirty-thirty rifle specially for [him]," and that he was going to "cut [his] throat and suck [his] blood." None of this testimony was allowed into evidence. Though prior to, and after, *voir dire* defendant testified, without objection, that he and John Allen Hall "had a shootout one time." The court also sustained the prosecutor's objections to defendant's testimony that he knew Hall had been twice convicted of murder and that Hall's reputation for danger and violence was "murder."

Defendant argues that "a defendant who claims self-defense is entitled to present this kind of evidence, and since the judge's refusal to admit the evidence deprived him of his only line of defense, [he] is entitled to a new trial." We disagree. In order for such evidence to be admissible defendant must do more than *claim* self-defense; he must put on evidence of self-defense:

> It is true that upon a proper showing that the accused in a homicide case may have acted in self-defense, the jury is entitled to hear and evaluate evidence of uncommunicated threats, *State v. Goode*, 249 N.C. 632, 107 S.E. 2d 70 (1959); communicated threats, *State v. Rice*, 222 N.C. 634, 24 S.E. 2d 483 (1943); specific acts of violence, *State v. Johnson*, 270 N.C. 215, 154 S.E. 2d 48 (1967); and evidence of the general character of the deceased as a violent and dangerous man, *State v. Johnson, supra*. However, as a condition precedent to the admissibility of such evidence, the defendant must first present viable evidence of the necessity of self-defense. "[T]here must be evidence . . . that the party assaulted believed at the time that it was necessary to kill his adversary to prevent death or great bodily harm, before he may seek refuge

in the principle of self-defense, and have the jury pass upon the reasonableness of such belief." *State v. Rawley*, 237 N.C. 233, 237, 74 S.E. 2d 620, 623 (1953). . . . "A defendant, when acting in his proper self-defense, may use such force only as is necessary, or as reasonably appears to him *at the time of the fatal encounter* to be necessary, to save himself from death or great bodily harm." (Emphasis added.) *State v. Fowler*, 250 N.C. 595, 598, 108 S.E. 2d 892, 894 (1959).

*State v. Allmond*, 27 N.C. App. 29, 31, 217 S.E. 2d 734, 736-37 (1975).

The evidence established that defendant shot Hall twice in the groin, and after Hall stumbled from the kitchen into the living room falling down by the stereo, defendant, rather than leaving through the back door, walked over to Hall, stood above him for a few seconds, and then fired the fatal bullet into Hall's head as Hall was raising his hand. Defendant admitted that when he shot Hall he did not know if Hall had a gun.

Defendant's own evidence shows that, at least at the time of the fatal shot to the head, the deceased did not actually present any threat of imminent harm to the defendant nor did he appear to be doing so. We hold the trial court correctly excluded the evidence defendant contends should have been admitted.

[2] Next, defendant contends the trial judge committed plain error by instructing the jury that second-degree murder is an unlawful killing *without* malice, instead of the correct standard, *with* malice. The defendant's argument concerns the trial court's final mandate to the jury:

Now I have told you what is to be required to be proved by the state with respect both to second degree murder and with respect to voluntary manslaughter. I did not define them, but *second degree murder is the unlawful killing of a human being without malice* and you will consider that in light of the instructions I have given you as to what the state must prove in order for you to return a verdict of guilty of second degree murder. Voluntary manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation, and you would consider that in light of what I have already instruct [*sic*] you must be proved

by the state in order for you to return a verdict of guilty as to that. (Emphasis added.)

Second-degree murder is the unlawful killing of a human being *with* malice. *State v. Mapp*, 45 N.C. App. 574, 264 S.E. 2d 348 (1980). Thus, the trial court's instruction that second-degree murder is the unlawful killing of a human being *without* malice was error. The defendant, however, failed to object to the instruction at trial and is precluded by North Carolina Rules of Appellate Procedure, Rule 10(b)(2), from challenging the instruction on appeal unless it constitutes plain error. *State v. Odum*, 307 N.C. 655, 300 S.E. 2d 375 (1983). The test for plain error is set out in *State v. Odum, supra*, as follows:

> [T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a "*fundamental* error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done," or "where [the error] is grave error which amounts to a denial of a fundamental right of the accused," or the error has " 'resulted in a miscarriage of justice or in the denial to appellant of a fair trial' " or where the error is such as to "seriously affect the fairness, integrity or public reputation of judicial proceedings" or where it can be fairly said "the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."
>
> *United States v. McCaskill*, 676 F. 2d 995, 1002 (4th Cir. 1982) (footnotes omitted) (emphasis in original) . . . .

*Id.* 307 N.C. at 660, 300 S.E. 2d at 378. Having examined the entire record as directed by *State v. Odum, supra*, including construing the jury charge contextually as a whole, *State v. Litchford*, 78 N.C. App. 722, 338 S.E. 2d 575 (1986), we find no plain error, for the reasons which follow.

While the defendant is correct that the trial court misstated the definition for second-degree murder in its final mandate, defendant concedes that prior to his final mandate, the judge correctly described the elements of both second-degree murder and voluntary manslaughter. The trial court's instructions on second-

degree murder and voluntary manslaughter, given prior to the final mandate, were as follows:

> Now with respect to the charges, or the charge against the defendant, that charge being second degree murder, I instruct you that in order for you to find the defendant guilty of second degree murder the state must prove three things beyond a reasonable doubt: First, that the defendant intentionally and *with malice* shot John Allen Hall with a deadly weapon on or about December 27, 1981. Intent is a mental attitude which is seldom provable by direct evidence. It must ordinarily be proved by circumstances from which it may be inferred. You arrive at the intent of a person by such just and reasonable deductions from the circumstances proven as a reasonably prudent person would ordinarily draw therefrom. *Malice* means not only hatred, ill will, or spite as it is ordinarily understood, but of course that is *malice*, but it also means that condition of the mind which prompts a person to take the life of another person intentionally, or to intentionally inflict serious bodily harm which proximately results in the death of that person without just cause, excuse, or justification. Now a .38 calibre pistol, or a .38 calibre of the type described as State's Exhibit No. 1, is a deadly weapon, for a deadly weapon is a weapon which is likely to cause death or serious injury. Then the state must prove that the shooting of the defendant by the said—excuse me, that the shooting of the said John Allen Hall by the defendant was the cause of the death of John Allen Hall. Now I would instruct you that a proximate cause is a real cause, a cause without which the death of the said John Allen Hall would not have occurred. So if the state has proved to you beyond a reasonable doubt that the defendant intentionally killed John Allen Hall with a deadly weapon, or intentionally inflicted a wound upon John Allen Hall with a deadly weapon that proximately caused his death, then the law implies first that the killing was unlawful and second, that *it was done with malice*; you may then infer that the killing was unlawful and second, that *it was done with malice*, but you are not compelled to do so. You may consider this along with all other facts and circumstances in determining whether the killing was unlawful and whether or not *it was done with malice*, but if the killing was unlawful,

and *was done with malice*, the defendant would be guilty of *murder in the second degree*. Now in this case you will be given the opportunity of returning three possible verdicts. You may find the defendant guilty of second degree murder; you may find him guilty of voluntary manslaughter, or you may find the defendant not guilty. Now I have just explained to you as to what second degree murder is. Now voluntary manslaughter is the unlawful killing of a human being *without malice*; so a killing *is not committed with malice* if the defendant acts in the heat of passion upon adequate provocation. Now the heat of passion does not mean mere anger; it means that the defendant's state of mind was at the time so violent so as to overcome reason, so much so that he could not think to the extent necessary to form a deliberate purpose and control his actions. And adequate provation [*sic*] may consist of anything which has a natural tendency to produce such passion in a person of average mind and average disposition, and then the shooting must have occurred so soon after the provocation that the passion of a person of average mind and average disposition would not have cooled at that time. And of course the burden is on the state to prove that—beyond a reasonable doubt that the defendant did not act in a heat of passion upon adequate provocation, but rather *that he acted with malice*. But if the state fails to prove that he acted with malice, then the defendant can be guilty of no more than voluntary manslaughter. So I charge if you find from the evidence beyond a reasonable doubt that on or about the 27th of December, 1981, the defendant, Ellehue Jones, intentionally *and with malice* shot John Allen Hall with a deadly weapon, and of course I instruct you that the gun identified as State's Exhibit 1 is a deadly weapon within the meaning and spirit of the statute, the criminal statute of this state, thereby proximately causing the death of John Allen Hall, it would be your duty to return a verdict of *guilty of second degree murder*. However, if you do not so find or if you have a reasonable doubt as to one or more of these things, you would not return a verdict of second degree murder, and then you would consider as to whether or not the defendant is guilty of voluntary manslaughter. If you find from the evidence beyond a reasonable doubt that on or about the 27th of December, 1981, the defendant, Ellehue

Jones, intentionally shot John Allen Hall with a deadly weapon, and I instruct you that a .38 calibre weapon, pistol as described in state's Exhibit 1, within the meaning and spirit of the statute, thereby proximately causing the death of John Allen Hall, it would be your duty to find the defendant guilty of voluntary manslaughter; but if you do not find, or have a reasonable doubt as to one or more of these things, you would return a verdict of not guilty. (Emphasis added.)

In light of the fact that the trial court (1) repeatedly instructed the jury that they must find the defendant acted with malice in order to find him guilty of second-degree murder, and (2) instructed the jury that if the State failed to prove the defendant acted with malice, then defendant could be guilty of no more than voluntary manslaughter; we find its misstatement in the final mandate does not constitute plain error. In this case we cannot say that the instructional mistake had a probable impact on the jury's finding that the defendant was guilty. *See State v. Litchford, supra.*

Finally, we consider defendant's assignments of error concerning his sentencing. The trial court found that the aggravating factors outweighed the mitigating factors and sentenced the defendant to twenty years in prison. Defendant contends that the trial court incorrectly found as aggravating factors that (1) "[t]he offense was especially heinous, atrocious, or cruel"; and (2) "[t]he defendant knowingly created a great risk of death to more than one person by means of a weapon . . . which would normally be hazardous to the lives of more than one person." Defendant also assigns as error the trial court's failure to find as a mitigating factor that "[p]rior to arrest or at an early stage of the criminal process, the defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer."

[3] With respect to the aggravating factor that the offense was especially heinous, atrocious, or cruel, we hold there was evidence before the trial court to support such a finding. In determining the appropriateness of this factor under the Fair Sentencing Act, "the focus should be on whether the facts of the case disclose *excessive* brutality, or physical pain, psychological suffering, or dehumanizing aspects *not normally present in that offense*." [Em-

phasis in original.] *State v. Blackwelder,* 309 N.C. 410, 414, 306 S.E. 2d 783, 786 (1983). The facts surrounding Mr. Hall's murder meet this test. The first two shots fired by the defendant into Hall constitute excessive brutality, physical pain, or psychological suffering, or dehumanizing aspects not normally present in the offense. Defendant fired the first two shots from close range into Hall's groin, leaving "four wounds, four holes in the scrotum" of Mr. Hall. Defendant then walked over to Hall, who was lying on the living room floor, stood over him for a few seconds, then fired a third and fatal bullet into Hall's head. The record supports the trial court's finding that the offense was especially heinous, atrocious, or cruel. *See State v. Vaught,* 318 N.C. 480, 349 S.E. 2d 583 (1986).

[4] We agree with the defendant, however, that the trial court was in error in finding as an aggravating factor that the defendant knowingly created a great risk of death to more than one person by the use of a weapon which would normally be hazardous to the lives of more than one person. In *State v. Bethea,* 71 N.C. App. 125, 129, 321 S.E. 2d 520, 523 (1984), we held:

> The legislature intended this aggravating factor to be limited to those weapons or devices which are indiscriminate in their hazardous power. Automatic weapons such as machine guns or bombs would fit that description. These weapons are *normally* hazardous to the lives of more than one person. A rifle, while it may *sometimes* be dangerous to the lives of more than one person, is not so *normally.* (Emphasis in original.)

We hold that, like a rifle, a .38 caliber handgun is not normally dangerous to the lives of more than one person. The trial court erred in finding this aggravating factor and defendant is entitled to a new sentencing hearing.

[5] Lastly, we hold the trial court did not err in failing to find as a mitigating factor that, prior to arrest or at an early stage of the criminal process, the defendant voluntarily acknowledged wrongdoing in connection with the offense to a law enforcement officer. While defendant confessed the details of the shooting to a law enforcement officer, at trial he sought, unsuccessfully, to rely on self-defense. A defendant who seeks to rely on self-defense is not entitled to the mitigating factor at issue here. *State v. Rathbone,* 78 N.C. App. 58, 336 S.E. 2d 702 (1985), *disc. rev. denied,* 316 N.C. 200, 341 S.E. 2d 582 (1986).

In sum, we find no error in the trial court's evidentiary rulings, and no plain error in its instructions. We remand, however, for a new sentencing hearing.

Affirmed in part, reversed in part, and remanded.

Chief Judge HEDRICK and Judge EAGLES concur in the result.